UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

---

MAYA MCKENZIE,

    Plaintiff,

v.                                                                                          Case No.

SPROUTS FARMERS MARKET, and
SFM, LLC,                                                                     **JURY DEMANDED**

    Defendants.

---

**COMPLAINT**

---

Comes now Plaintiff, Maya McKenzie, and brings this action against Defendants, Sprouts Farmers Market, Inc. and SFM, LLC (collectively, "Defendants"), for gender, pregnancy, and race discrimination, and retaliation in violation of the Tennessee Human Rights Act ("THRA"), as codified at T.C.A. §§ 4-21-101 et seq., and race discrimination in violation of the Civil Rights Act of 1866, 42 U.S.C. § 1981. Plaintiff intends to move for leave to amend her Complaint to add claims of disability discrimination under the Americans with Disabilities Amendments Act of 2008 ("ADA-AA"), as codified and amended at 42 U.S.C. § 12101 et seq., and gender, race, and pregnancy discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., upon receipt of her right to sue letter from the EEOC. In support, Plaintiff would state as follows:

**I. PARTIES**

1.    Plaintiff Maya McKenzie ("Ms. McKenzie") is an African-American female

1

resident of Shelby County, Tennessee and former Vitamin Manager for Defendants.

2.  Defendants operate a supermarket chain headquartered in Phoenix, AZ doing business at 576 S. Perkins Rd., Memphis, TN 38117.  Defendants report its principal address as 5455 E. High Street, Suite 111, Phoenix, AZ 85054.  At all relevant times herein, Defendants have employed more than fifteen (15) employees.

## II. JURISDICTION

3.  The Court has jurisdiction over Plaintiff's claims brought through 28 U.S.C. § 1981 pursuant to 28 U.S.C. §§ 1331, 1343(3).  The Court has supplementary jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

## III. STATEMENT OF FACTS

4.  Ms. McKenzie was originally hired by Defendant in early May, 2015 and worked for Defendant as a Vitamin Clerk until August 2015 when Ms. McKenzie took a position as a "Demo Representative" for vitamin and supplement manufacturers.  In the role of Demo Rep., Ms. McKenzie worked closely with Defendants to educate their workforce on the products contained in the Vitamin section of their stores.

5.  In or around February 2017, Defendants hired Ms. McKenzie back and placed her in the position of Assistant Manager at its Germantown location at 3150 Village Shops Dr. #105, Germantown, TN 38138.

6.  In May 2017, Defendants transferred Ms. McKenzie to assist in the preparation of opening of the new East Memphis location at 576 S. Perkins Rd., Memphis, TN 38117.  ("East Memphis Location").

7.      After joining the East Memphis Location, Ms. McKenzie quickly became subject to a series of unwelcome sexual advances from Mr. Charles Sanders, Regional Grocery Manager, who was in a senior position over her with the power to issue discipline or terminate employment. Mr. Sanders (Black Male) and Mr. Ryan Kelly (Black/Hispanic Male), Regional Director, spent approximately three (3) weeks in the East Memphis location preparing the store for launch. All managers were working closely alongside one another. In his interactions with Ms. McKenzie during this time, Mr. Sanders routinely commented on Ms. McKenzie's appearance. He would tell her how pretty she looked and how much he liked the look of her pants.

8.      Further, in their interactions with Ms. McKenzie, Mr. Sanders and Mr. Kelly mentioned that they visit strip clubs while traveling for work. For example, in late June 2017, Ms. McKenzie received a call from Charles Sanders, who pulled her personal number from the Office Directory. He invited Ms. McKenzie to go to the strip club with him. Ms. McKenzie declined the invitation.

9.      On or about June 19, 2017, Defendants promoted Ms. McKenzie to the position of Vitamin Manager at its East Memphis location Mr. Chris Jessie, the Regional Vitamin Director (white male), made the decision to promote Ms. McKenzie.

10.     Mr. Sanders' unwelcome and suggestive remarks continued into July of 2017, as he repeatedly commented on Ms. McKenzie's body and attire. Mr. Sanders would frequently make comments such as, "your boyfriend is so lucky."

11.     During June and July of 2017, Ms. McKenzie became pregnant. She did not disclose this pregnancy and continued her work as a manager. The company was undergoing its launch at the East Memphis Location, and Ms. McKenzie did not wish to let her team down.

12. On or about July 12, 2017, Ms. McKenzie had a miscarriage at work due to the demands of her job. She took two (2) days off due to her miscarriage and notified Human Resources that this was the basis of her leave.

13. On or around August 2017, Mr. Sanders continued to stay around at the East Memphis Location. He continued to make suggestive comments to Ms. McKenzie. On multiple occasions, Mr. Sanders would approach Ms. McKenzie in the "back room" of the store, absent any other employees. The two were alone in the "back room." Mr. Sanders is approximately 6'1" and 300 lbs. Ms. McKenzie is barely 5'0". Naturally, Ms. McKenzie felt threatened. She immediately raised her concerns to Tony Owen (White Male), Interim Store Manager, who took no action.

14. Following the departure of Chris Jesse (White Male), Regional Vitamin Manager and Ms. McKenzie's direct supervisor, Mr. Charles Sanders was appointed Interim Regional Vitamin Manager on or about September 29, 2017. He thus became Ms. McKenzie's direct supervisor.

15. In or about October of 2017, Mr. Sanders' unwelcomed sexual comments persisted, as he propositioned to pay Ms. McKenzie's car note in exchange for sex. Ms. McKenzie again declined the offer. At the time of this propositioning, Mr. Sanders was Ms. McKenzie's direct supervisor.

16. Also, during this same conversation, Mr. Sanders informed Ms. McKenzie that "they" felt they hired too many black folks at the East Memphis Location. Mr. Sanders and Mr. Kelly often stated that they hired too many "Memphis people," which was understood as thinly vailed code for black employees. Mr. Sanders stated that the store was failing, to which he attributed to there being too many black employees. Further, Mr. Sanders stated that they were

4

planning to "white out the store." Notably, Defendants fired at least ten (10) African American employees over the course of the following year.

17. Also, on or around October 2017, Ms. Terri Payne became the Store Manager at the East Memphis Location.

18. In or about November 2017, Ms. McKenzie reported Mr. Sanders' inappropriate behavior to Ms. Terri Payne. Ms. Payne took the complaint seriously and immediately reported the matter to senior personnel in Arizona.

19. Following this complaint, "Bethany", a Human Resources Representative, flew out from Arizona and held a meeting with Ms. McKenzie. Bethany also met with Mr. Sanders and Mr. Kelly.

20. On or about December 27, 2017, Defendant hired Danni Spatola, who was from Arizona, as Vitamin Regional Manager. Notably, Ms. Spatola had no background in vitamins, but instead was from accounting. Nevertheless, Ms. Spatola effectively became Ms. McKenzie's new direct supervisor.

21. Upon Ms. Spatola's hiring, she immediately began a campaign of retaliation against Ms. McKenzie that continued until Ms. McKenzie's termination. Ms. Spatola began by criticizing Ms. McKenzie's business decisions. Ms. Spatola was fishing for reasons to terminate Ms. McKenzie.

22. For example, in early January 2018, Ms. Spatola criticized Ms. McKenzie for the purchase of a certain brand of collagen. Shortly thereafter, on or about January 7, 2018, Ms. McKenzie sold all the collagen that was purportedly an issue.

23. On or about February 7, 2018, Ms. McKenzie arrived at work to find Ms. Spatola

5

digging through Ms. McKenzie's storage drawer and personal cabinet. Ms. McKenzie has worked at all three Memphis locations, and this was an unprecedented action.

24.  On or about February 9, 2018, Ms. Spatola criticized Ms. McKenzie's ability to order product, and reported to management that Ms. McKenzie needed to be retrained.

25.  Further, Ms. Spatola would regularly gather products from the East Memphis Location to fill the holes at the Germantown location. Notably, Ms. Spatola did not fill any holes at the East Memphis location.

26.  In addition to the sexual harassment and retaliation she experienced during her employment with Defendants, Ms. McKenzie was also subjected to discrimination on the basis of her pregnancy.

27.  On March 2, 2018, Ms. McKenzie discovered she was pregnant. She immediately notified her supervisor, Ms. Spatola. Ms. McKenzie further explained that she would be unable to perform heavy lifting and that she would need time off to go to doctors' appointments because she was deemed a high risk due to her previous miscarriage.

28.  After notifying Defendants of her pregnancy, Ms. McKenzie was refused accommodations at work. Further, around this time, Ms. McKenzie's hours decreased, but the demands increased. As such, Ms. McKenzie was still working 6 days out the week.

29.  For example, on March 27, 2018, Ms. McKenzie drove to Murfreesboro, TN for a regional meeting. Ms. Spatola stated that she booked Ms. McKenzie a hotel room because of her pregnancy. Following the meeting, Ms. McKenzie discovered that Ms. Spatola did not book her a room, which required Ms. McKenzie to buy a room with money out of her own pocket.

30.  On a separate occasion, on or about May 7, 2018, Ms. McKenzie was told by a

Human Resources representative that she could not wear pants with an elastic waistband to work unless she had a doctor's note.  This HR Representative knew Ms. McKenzie was pregnant when she approached Ms. McKenzie because Ms. McKenzie had requested for her FMLA paperwork earlier that day.  Notably, the elastic pants were never an issue until Ms. McKenzie notified Defendant of her pregnancy.

31. On or about May 9, 2018, Ms. Spatola openly commented that Ms. McKenzie was pregnant out of wedlock.

32. Additionally, Ms. McKenzie regularly asked Ms. Spatola for extra help (i.e., more hands and more experienced workers) in her department since she was pregnant.  However, Ms. McKenzie's requests for help were routinely ignored by Ms. Spatola.

33. In particular, Ms. McKenzie asked in for extra help ahead of "inventory day" on May 23, 2018, which requires lots of heavy lifting, climbing, and bending down for extended periods of time.  Obviously, such demands would be problematic for an individual with a high-risk pregnancy and would place Ms. McKenzie's health and the health of her unborn child at risk.

34. Nonetheless, Ms. McKenzie showed up for inventory day on May 23, 2018.  Upon her arrival, Ms. McKenzie was immediately approached by Ms. Spatola who asked her to meet with her and another supervisor, Tim Carpenter (White Male), Store Manager, in the "Cash Office."  This was an unusual request because meetings were never held in the Cash Office.  Further, employees are not allowed to be in the Cash Office unless you were a store manager, head cashier, or book keeper.  Ms. Spatola brought Ms. McKenzie into the Cash Office because it was secluded.  Because it was secluded and such an odd location for a meeting, Ms. McKenzie felt intimidated and uncomfortable.  Mr. Carpenter then placed two corrective action plans on the

7

counter as Ms. Spatola stood to the side. Notably, it is against company policy to a) administer any write up outside the management office, and b) administer two corrective actions simultaneously, as an employee only needs three to be terminated. Accordingly, Ms. McKenzie refused to sign the corrective actions. She then beelined out of the Cash Office in tears, clocked out, and pulled the Human Resources number.

35. Following this unprecedented meeting, Ms. McKenzie left the premises and notified Human Resources to explain what happened. The Human Resources Representative suggested that Ms. McKenzie go on Short-Term Disability to eliminate the stress and to keep her insurance.

36. That same day, Ms. McKenzie visited her doctor to check her blood pressure. While in the office, Ms. McKenzie began to get dizzy and see spots.

37. On May 24, 2018, Ms. McKenzie notified Mr. Owen that she would not be in that day and that she would return to work the following day.

38. On May 25, 2018, Ms. McKenzie returned to work to assist with inventory. She asked for copies of the corrective actions presented to her on May 23, 2018, and she was told that HR refused to administer the copies. Ms. McKenzie was skeptical that HR was actually notified of her request.

39. May 25, 2018 was Ms. McKenzie's last day of work, as her STD was approved and processed.

40. On or about June 1, 2018, Ms. McKenzie filed a charge against Sprouts Farmers Market with the EEOC.

41. On or around June 4, 2018, a former coworker of Ms. McKenzie stated that

8

Defendants were creating a case against her and that she would be demoted upon her return. Notably, the company had already hired a replacement, Jeremy Scott (white-male), on or around that time, to replace Ms. McKenzie.

42. On or about June 13, 2018, Ms. McKenzie was issued the Right to Sue notice from the EEOC.

43. Ms. McKenzie's son was born on November 12, 2018. She had a difficult delivery and contracted an infection that kept her in the hospital for five (5) days afterward.

44. Because Ms. McKenzie was supposed to return from her STD on November 21, 2018, she had requested that her leave be extended to attend to her newborn child. However, her request for extended leave was denied. Defendants had provided extended leave that protected an employee's job for other individuals, but refused to do so for Ms. McKenzie.

45. On December 13, 2018, Ms. McKenzie received paperwork from Defendant terminating her employment.

46. Defendants treated Ms. McKenzie differently and terminated her employment on account of her gender, race, pregnancy, and in retaliation for her complaining about sexual harassment.

47. As a result of Defendants' actions, Ms. McKenzie has suffered economic loss and emotional distress, anxiety, humiliation, and embarrassment.

48. Defendants actions were intentional, willful and taken with malice or reckless indifference to the rights of Ms. McKenzie.

## IV. CAUSES OF ACTION

49. Plaintiff incorporates the paragraphs above as if specifically set forth herein, and

9

for her causes of action asserts:

50. Defendants' actions constitute pregnancy discrimination in violation of the THRA, as codified T.C.A. §§ 4-21-101 et seq. Pregnancy discrimination is unlawful per the THRA. Here, Defendants unlawfully discriminated against Ms. McKenzie on the basis of pregnancy by failing to provide Ms. McKenzie with an accommodation that it provided other employees who suffered other disabilities or the need for extended leave.

51. Defendants' actions constitute sex and race discrimination, in violation of the THRA, as codified at T.C.A. §§ 4-21-101 et seq.

52. Defendants' actions constitute unlawful retaliation in violation of the THRA.

53. Defendants' actions constitute unlawful discrimination on account of race in violation of the Civil Rights Act of 1866, as codified at 42 U.S.C. § 1981.

## III. DAMAGES

54. As a direct result of Defendant's unlawful actions, Ms. McKenzie has suffered non-economic harm in the form of emotional distress, pain, humiliation and embarrassment. Additionally, as a direct result of Defendants' unlawful actions, Plaintiff has suffered economic harm in the form of lost wages and benefits and have sustained other pecuniary losses. Ms. McKenzie, as a result of Defendant's actions, have suffered damage to their professional career and professional reputation, as well as to their personal reputation.

## IV. RELIEF REQUESTED

WHEREFORE, Plaintiff prays that the Court cause service to be issued upon Defendant. Plaintiff further demands a jury to hear this cause, and upon a hearing thereon, prays that the Court:

55. Award Plaintiff Back pay, lost benefits, and other pecuniary losses proximately caused by Defendant's unlawful conduct;

56. Award Plaintiff compensatory damages against Defendant in an amount to be determined by the jury;

57. Award Plaintiff punitive damages against Defendants in an amount to be determined by the jury;

58. Award Plaintiff all costs, disbursements, pre-judgment interest, post-judgment interest, expert witness fees and reasonable attorneys' fees allowed under actions brought pursuant to T.C.A. §§ 4-21-101 et seq. and 42 U.S.C. § 1981; and

59. Such further relief as is deemed just and proper.

Respectfully submitted,

/s/ Robert A. Donati_____
Robert A. Donati – TN Bar #025355
Donald A. Donati – TN Bar #08633
Bryce W. Ashby - TN Bar #026179

DONATI LAW, PLLC
1545 Union Avenue
Memphis, TN 38104
Telephone: 901/278-1004
Fax: 901/278-3111
Email: robert@donatilaw.com
          don@donatilaw.com
          bryce@donatilaw.com